

**LIPSIUS – BENHAIM LAW, LLP**

80-02 Kew Gardens Road
Kew Gardens, NY 11415
212.981.8440
Facsimile 888-442-0284
www.lipsiuslaw.com

IRA LIPSIUS
Direct Line: 212-981-8442
Email: ilipsius@lipsiuslaw.com

August 22, 2012

**VIA ECF**

Judge William F. Kuntz, II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    **Shirley Wrubel v. John Hancock Life Ins. Co.**
              **Docket No. 11-cv-01873 (WFK) (LB)**

Dear Honorable Judge Kuntz:

      In accordance with Your Honor's Individual Motion Practices and Rules, we write in response to the pre-motion letter by defendant John Hancock Life Insurance Company ("JH"). JH will not be able to meet its burden for summary judgment because most of the key facts must be determined by a jury, including whether any of the alleged misrepresentations were material to the issuance of the policy and whether JH is estopped from rescission.

      Sara Hollander financed a diverse portfolio of investments in the years prior to her passing. Ms. Hollander owned investment property in Israel and in the United States, with her U.S. investments valued at $1 million in the months prior to the purchase of the JH policies. A World War II survivor, Ms. Hollander was extremely secretive about her financial planning and often kept the details of her investment from even her own family. As an unsophisticated investor, this sometimes led to disastrous results. In the years leading up to Ms. Hollander's procurement of the JH policies, she invested hundreds of thousands of dollars in cash with European entities in what we now know was a scam. Ms. Hollander believed she was worth at least $9 million when she applied for the policies.

      Ms. Hollander paid all of the policy premiums for policy 93 974 073 ("the 073 Policy"), totaling approximately $250,000, from a return on her property investment with Classon, LLC. Prior to purchasing the policies, Ms. Hollander was awarded $1 million from Classon, LLC by an arbitration panel. She used the money from the Classon investment to fund the 073 Policy.

      Ms. Hollander also funded the initial premiums for policy 94 051 075 ("the 075 Policy"). A few months after the second policy was purchased, Ms. Hollander decided to allow the 075 Policy to lapse. Her JH broker, Joel Goldberger, counseled Ms. Hollander to instead sell a portion of the policy to others, a practice sanctioned by New York law. Together with Ms.

LIPSIUS-BENHAIM LAW, LLP

Judge William F. Kuntz, II
August 22, 2012
Page 2

Wrubel's son-in-law, Mordechai Rubin, Ms. Hollander found one investor, Granite Equities, Inc., to purchase rights in $3 million of the $5 million 075 Policy.[1]

Ms. Hollander's financial representations, however, did not matter to JH, notwithstanding the guidelines. First, ignoring its own underwriting requirements, JH did not request a breakdown of the assets or verify any details concerning the alleged $9 million in assets. JH failed to inquire as to the source of the insured's income, which was reported to be $200,000 per year. Instead, it accepted blanket statements which violated the same JH underwriting guidelines it now claims entitle it to summary judgment.

Contravening the guidelines, JH's underwriters failed to obtain an MIB report on the insured or her husband which is what a reasonable financial underwriter would have done had the financial condition of the insured been material to the issuance of the Hollander policies.

Moreover, JH's underwriters did not even properly apply the formula in the guidelines because they failed to reduce Ms. Hollander's net worth by the $400,000+ in annual premiums, as required. In sum, a fact-finder can find that JH ignored its guidelines during underwriting and therefore cannot rely upon them to deny plaintiff's claim for the policy proceeds.

Not only did it ignore its guidelines, JH also ignored information contradicting the representations in the application. JH's credit report detailed an extremely poor credit history for Ms. Hollander which included the fact that 11 of her 12 credit accounts were in default and a maximum credit line of approximately $9,000, certainly not one of the woman represented in the application.

There is other evidence that JH chose not to financially underwrite the policies.[2]  JH admitted that long before the Hollander policies were issued, it knew that within the elderly high-value market, it was quite common for financial representations to be grossly overstated. Even if financial underwriting was material to JH in the bulk of its business, when it came to elderly high-value policies, JH made the conscience decision to participate in the market by neglecting to financially underwrite policies.

A fact-finder can easily conclude that JH chose to do so because it wanted to issue policies generating $400,000 in annual premiums. In the words of Justice Nunez in *Process Plants Corp. v. Beneficial National Life Ins. Co.*, 53 A.D.2d 214, 221 (1st Dept. 1976), "This

---

[1] John Hancock's claim that the 075 Policy was funded through a syndicate of 18 investors is a mischaracterization of the facts. The policy was funded by 18 accounts, almost all of which were "Gemachs" or religious free-loan societies. The money in the Gemach can be traced to either Granite Equities' three partners or Ms. Hollander.

[2] In discovery we asked Judge Bloom to allow us to review John Hancock's actual practice with similar risks and compel John Hancock to produce copies of other older age high-value policies. Judge Bloom denied our request. We were independently able to obtain approximately 15 similar policies which evidence that financial information was not material to the issuance of policies similar to the Hollander policies.

insurance company was more than happy to underwrite this large policy. . . Obviously the company was attracted by the prospect of fat premiums over a long period of time. [The insured's] premature sudden death must have been as unexpected and unforeseen to him and his beneficiary as it was to the defendant who gambled and lost." JH admitted that an insured's financial condition did not affect the mortality rate of a prospective insured. As far as JH was concerned, the risk it was insuring – how long Ms. Hollander was going to live – was unaffected by her net worth.

Although JH is correct in its assertion that by law, an insurer is not required to verify any information in an application, it is just as true that an insurer which knew or should have known of negative information concerning a prospective insured but chooses to issue the policy anyway, cannot later challenge the policies on those grounds.

First, a fact-finder may easily conclude that if the insurer chose to ignore that information, such information was not material to the insurer. In the face of such evidence, an insurer is not entitled to summary judgment, notwithstanding the self-serving statements of its underwriters that the faulty application is material to the issuance of the policy. See, *Ashkenazi v AXA Equit. Life Ins. Co*., 91 A.D.3d 576, 577 (N.Y. App. Div. 1st Dept. 2012) ("Summary judgment is premature at this juncture since there are issues of fact as to whether the decedent's net worth …[was] material to AXA's decision to issue the policy….whether AXA's submitted underwriting guidelines are complete, whether AXA routinely ignored its own requirement to confirm an insured's financial net worth via an inspection report, and whether the financial information or any additional existing policies was material to AXA's underwriting decisions."); *Alaz Sportswear v. Public Serv. Mut. Ins. Co*., 195 A.D.2d 357, 358 (1st Dept. 1993) ("[t]he materiality of a particular nondisclosed fact is generally a question of fact for the jury."); *Henriques v Metropolitan Life Ins. Co*., 2012 N.Y. Misc. LEXIS 2732, 16-17 (N.Y. Sup. Ct. 2012).

The similarities between this case and *Settlement Funding, L.L.C. v. AXA Equitable Life Insurance Co*., Civil Action No. 1:09-CV-08685 (HB) (SDNY 2010) are striking. In *Settlement Funding*, a jury found that despite inaccuracies of financial information in the insurance application, AXA did not reasonably rely on the financial misrepresentations. In that case, it was shown at trial that AXA failed to obtain tax returns, financial statements, or bank records relating to the insured during AXA's underwriting process.

Further, an insurer that accepts premiums on a policy despite the fact that it knew or should have known that the application contained inaccurate information is barred from rescinding on those grounds. *Am. Gen. Life Ins. Co. v. Salamon*, 2012 U.S. App. LEXIS 10226 (2nd Cir. N.Y. May 22, 2012). Here, a fact-finder may find that JH knew or should have known that the financial application contained inaccurate financial information but chose to issue the policy anyway.

Judge William F. Kuntz, II
August 22, 2012
Page 4

  Since there are material questions of fact concerning both Ms. Hollander's actual financial condition and whether financial information was material to JH when issuing the Hollander policies, summary judgment is unwarranted.

             Respectfully submitted,

             LIPSIUS-BENHAIM LAW, LLP

             Ira S. Lipsius

ISL:bl